J. D. Gillis and Ruth Gillis, et al. [1] v. Commissioner. Gillis v. Commissioner
Docket Nos. 77574-77576.
United States Tax Court
T.C. Memo 1960-71; 1960 Tax Ct. Memo LEXIS 220; 19 T.C.M. (CCH) 383; T.C.M. (RIA) 60071; April 11, 1960
*220 Held, respondent erroneously determined that partnership of which male petitioners were sole partners actually or constructively received additional income in the amount of $76,703.75 during 1953. Held, further, petitioners have failed to prove by a clear preponderance of the evidence that the partnership did not receive additional income in 1953 in the amount of $650. J. M. McMillin, Esq., 2614 Gladstone Drive, Dallas, Tex., for the petitioners. Harold Friedman, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion Respondent determined deficiencies in the income taxes of petitioners for the year 1953 *221 in amounts as follows: Docket
No.
Petitioners
Deficiency
77574
J. D. Gillis and Ruth Gillis
$10,243.44
77575
A. K. Gillis and Ruth Gillis
12,874.86
77576
B. G. Gillis
10,986.06
The contested adjustment was the increase in petitioners' distributive shares of the income of a partnership in which the male petitioners were equal partners, explained in the statutory notice to J. D. Gillis and Ruth Gillis, as follows: "(a) It is determined that four checks mailed to the A. K. Gillis, J. D. Gillis, and B. G. Gillis partnership on December 9 and 14, 1953, as itemized below, in the aggregate amount of $77,353.75, were actually or constructively received by the partnership in 1953 instead of in 1954 as reported in its 1954 return. Therefore, the partnership income is here increased $77,353.75." Similar explanations were contained in the statutory notices to the other petitioners. By reason of taking the said amount of $77,353.75 out of the partnership income of 1954 and placing that amount in the partnership income of 1953, respondent determined an overassessment in petitioners' favor for 1954. However, the overassessments are substantially less than the *222 deficiencies determined. We, of course, have no jurisdiction over the overassessments. The issue presented as to each petitioner is whether the partnership in which the male petitioners were sole and equal partners actually or constructively received additional income during 1953 in the amount of $77,353.75. Findings of Fact A stipulation of facts has been filed by the parties and is incorporated herein by this reference. Petitioners J. D. Gillis and wife Ruth Gillis, A. K. Gillis and wife Ruth Gillis, and B. G. Gillis are individuals whose residences are in Sulphur Springs, Texas. A. K. Gillis, father of J. D. Gillis and B. G. Gillis, is hereinafter referred to as Gillis. Income tax returns for all petitioners for the year 1953 were filed with the district director of internal revenue, Dallas, Texas. During the years 1953 and 1954, and for some years prior thereto, A. K. Gillis, J. D. Gillis, and B. G. Gillis engaged in business as a partnership under the name of A. K. Gillis and Sons (hereinafter referred to as the partnership), with principal place of business at Sulphur Springs, Texas. The business office of the partnership was located in the residence of Gillis. The *223 partnership was primarily engaged in the business of highway and railway roadbed construction and reconstruction under contract. Each partner owned a one-third interest in the partnership. The partnership kept its books, and each partner reported his individual income, on a cash receipts and disbursements basis. During 1952, 1953, 1954, and thereafter the partnership performed work under contract for the Louisiana and Arkansas Railway Company (hereinafter referred to as the L. & A.). The L. & A. has its headquarters at Shreveport, Louisiana. As the partnership performed work for the L. & A., it prepared and mailed invoices billing the railroad for the work performed. The L. & A. issued voucher checks in payment of the invoices, entering in a cash voucher register information identifying each check issued and the date on which each check was mailed. Mail addressed to the partnership was delivered to Gillis' home where it was usually opened by Gillis, although the other partners and the partnership's bookkeeper upon occasion opened the mail. The partnership kept no record of the date or time checks were received. After receipt, Gillis deposited the checks in the partnership's bank *224 account and delivered receipted deposit slips to the partnership's bookkeeper. The other partners and the bookkeeper were authorized to deposit checks, and upon occasion did so, but as a general rule Gillis made the deposits. Sometimes Gillis verified the correctness of payment with the bookkeeper prior to depositing checks. Generally, entry of receipts was first recorded upon the books of the partnership when the bookkeeper received receipted deposit slips. During 1952 and 1953, the average number of days by which deposit followed mailing for all checks, for checks for amounts in excess of $10,000, and for checks for amounts under $500, from the L. & A. to the partnership, excluding the checks here in issue, are as follows: Checks
Checks
All
over
under
Year
Checks
$10,000 $500
1952
6.00
4.43
10.00
1953
3.97
2.33
4.85 During these years payment of all invoices, exclusive of those underlying the checks in issue, which the partnership submitted to the L. & A. after the first, and before the tenth, day of each month was received and deposited prior to the end of the month in which the invoice was submitted. In November and December 1953, *225 the partnership submitted numbered and dated invoices, in payment of which records of the L. & A. show checks to have been mailed, as follows: Invoice
Date of
Amount of
Date
No.
Invoice
Check
Mailed
567
11-12-53
$ 250.00
12- 9-53
568
11-12-53
200.00
12- 9-53
569
11-12-53
200.00
12- 9-53
570
12- 2-53
571
12- 2-53
76,703.75
12-14-53
572
12- 2-53
The invoices for $250, $200, and $200 were for dirt easements which the partnership had purchased for the L. & A. and were not for work which the partnership had performed under its contract. The first six days of 1954 fell on the days of the week, as follows: Date
Day
January 1
Friday
January 2
Saturday
January 3
Sunday
January 4
Monday
January 5
Tuesday
January 6
Wednesday
All of these checks were deposited in the partnership bank account on January 6, 1954, by A. K. Gillis. The check in the amount of $76,703.75 was received by the partnership after December 31, 1953, and early in January 1954. It was the custom of the partnership to confer with a tax consultant shortly after the close of each taxable year on any matters that might affect preparation and *226 filing of the partnership return of income. On or about January 15, 1954, Gillis and the partnership bookkeeper consulted with the tax consultant and discussed the proper reporting of the checks in issue. The partnership return of income for the taxable year 1953 was executed by Gillis on March 12, 1954, and received by the district director of internal revenue, Dallas, Texas, on March 15, 1954. A schedule of income attached to the return read, in part, as follows: Received from L. & A. Railway
Company, Shreveport, La. dur-
ing 1953 the sum of (for work
done in 1952)
$ 20,436.99
Received from L. & A. Railway
Company, Shreveport, La. dur-
ing 1953 the sum of (for work
done in 1953)
304,483.55
The L. & A. Railway Company, Shreveport,
La., reported they had paid me the sum
of $408,057.30 in 1953, which is $103,573.75
more than I received in 1953. Being on
Cash and disbursement basis, I am only
reporting the amount actually received in
1953. The balance was received in Janu-
ary and February 1954. I also have de-
ductions that accured in 1953, but
did not pay until 1954 and therefore not
deducting any expense not paid out in
1953.
*227 Records of the L. & A. show that a check in the amount of $26,220 in payment of three invoices dated December 30, 1953, was mailed to the partnership on February 3, 1954. This check for $26,220 is not involved in this proceeding. The distance by rail between Shreveport, Louisiana, and Sulphur Springs, Texas, is 133.2 miles. There was no direct mail service between Shreveport and Sulphur Springs in 1953; mail from Shreveport to Sulphur Springs would go either by way of Texarkana or by way of Dallas and thence to Sulphur Springs. During that year, normal mail delivery time between these two points was two to three days. Delays in delivery of mail may occur when distributors missend mail; when postal workers fail completely to empty mail sacks; or when letter carriers misdeliver mail and recipients fail promptly to return misdelivered mail. Each additional handling of mail increases the chance of delay. The probability of delayed mail increases in the Christmas season by reason of increased volume of mail and of a great number of inexperienced temporary postal workers. The partnership reported gross income in the amounts of $331,165.54 for 1953 and $142,182.83 for 1954. Opinion
*228 BLACK, Judge: The sole issue herein is whether the partnership in which the male petitioners each held one-third interests actually or constructively received certain checks in payment of services performed by the partnership in 1953, as respondent has determined, or in 1954, as the partnership and petitioners reported. The statutory [2] and regulatory [3] sections involved are set forth marginally. *229 Four checks are here involved: three of them, each in the respective amounts of $250, $200, and $200, were mailed by the L. & A. on December 9, 1953; one, in the amount of $76,703.75, was mailed by the L. & A. on December 14, 1953. The partnership deposited all four checks on January 6, 1954, and reported them as received in that year. Although the partnership kept no records of the date and time that checks were received by mail, it was the standing policy of the partnership to deposit checks within a few days of their receipt. Records of the L. & A. and the partnership show that all checks, excluding the checks here in question, were deposited on an average of 6 days after mailing during 1952, and about 4 days after mailing in 1953. This lapse of time between mailing and deposit for checks in amounts under $500 was 10 days in 1952 and about 5 days in 1953. The lapse for checks in amounts over $10,000 was about 3 days in 1952 and 2 days in 1953. It has been stipulated that the average mailing time between Shreveport and Sulphur Springs during 1953 was 2 to 3 days. It was the partnership's policy during 1953 to deposit large checks within 1 to 2 days of receipt but more time was *230 taken in the deposit of smaller checks. It was another policy of the partnership to obtain advice from a tax consultant about the middle of January as to matters affecting the reporting of partnership income. Two witnesses testified that they discussed the proper year in which to report the particular checks in issue within 2 weeks of their deposit. One of these witnesses was A. K. Gillis, the managing partner of the business and the father of the other two partners. The other of these two witnesses who thus testified was the bookkeeper of the partnership who had been the bookkeeper for a good many years. These two witnesses testified that the checks were received in January 1954. The testimony of one witness, the bookkeeper, however, was based exclusively on the fact that the checks were deposited in January. The other witness, A. K. Gillis, testified that he opened the mail and remembered receiving the large check in January 1954. The check represented approximately 19 percent of the partnership's 1953 income as adjusted by respondent or approximately 54 percent of its reported 1954 income. In the face of such testimony and evidence, respondent relies upon the presumptive correctness *231 of his determination as buttressed by the inferences arising from the length of time elapsing between the mailing of the checks and their deposit and from the tax advantages to petitioners of reporting the income in 1954, a less successful year for the partnership than 1953. While we do not commend the partnership for not maintaining a more accurate record of the dates on which checks were received, we have concluded, and have so found, that the partnership actually received the check in the amount of $76,703.75 in 1954. As to the other three checks, aggregating $650, they were in payment of dirt easements which were purchased by the partnership for the L. & A. It is a reasonable inference, we think, that they were mailed in one separate envelope by the L. & A. During the course of his testimony the witness Gills was asked the question: "Do checks ever come from the company, several in the same envelope"? The answer of Gillis was, "Oh, yes, very frequently." In view of this testimony we think it is a reasonable inference that the three small checks were mailed by the L. & A. in one envelope. The records of the L. & A. show they were all three mailed on the same day, December 9, 1953. *232 The records of the L. & A. also show that the large check for $76,703.75 was not mailed until 5 days afterward. Therefore, it seems entirely clear that the large check was not mailed in the same envelope as the three smaller checks. Also, it is a circumstance established by the evidence that smaller checks like the first three in question were not deposited by the partnership as soon after their receipt as were the larger checks. Therefore, we think it is quite likely that these three small checks were received by the partnership prior to January 1, 1954, and on account of the intervening holiday period and weekend were not deposited until January 6, 1954. The witness Gillis testified in effect that he did not have any independent recollection as to just when these three small checks were received but that considering the fact that he deposited them with the bank on January 6, 1954, the checks must have been received early in January 1954. However, considering the facts and circumstances surrounding these three small checks which we have enumerated above, we have been unwilling to make a finding that they were received sometime early in January 1954. The situation is different as *233 to the check for $76,703.75. The witness Gillis who made the deposit in question testified that he remembers this $76,703.75 check and that the check was received in January 1954. As to that check he testified, "I remember when I got that big check. I remember that much." In view of this positive testimony of Gillis and the further fact that there is every reason to believe that he is a responsible and trustworthy businessman, we have made a finding that "The check in the amount of $76,703.75 was received by the partnership after December 31, 1953, and early in January 1954." Another argument that respondent strongly urges as to why we should uphold his determination is that the petitioners had a motive in placing the checks in question in 1954 gross income rather than 1953 because 1953 was a more profitable year than 1954. It is true that subsequent events proved 1954 a less profitable year than 1953. Placing the checks in 1953 income rather than in 1954 results in deficiencies for each petitioner for 1953 and in overassessments for each petitioner in 1954. We think, however, that petitioners have effectively replied to this argument of respondent when they say in their brief as *234 follows: "Mr. Gillis also testified that he had no way of knowing in December, 1953 what the partnership income would be in 1954 and could not know if a shifting of income from the year 1953 to 1954 would be to the partnership's advantage or disadvantage. "He stated, however, that the L. & A. Ry. Company had a very large contract which it intended to let in the Spring of 1954 and that he had every assurance that he would get the contract and that it would be a profitable one. For some reason the railway decided to delay this contract but it was let in January, 1955, and it was let to the partnership. He had good reason to believe that the year 1954 would be a profitable year for the partnership." We are convinced that the shifting of profits from 1953 to 1954 had nothing to do with the decision by the partnership to report the checks here involved in 1954 gross income. That argument of respondent we do not think is sustained by anything in the record. Respondent urges that the partnership constructively received all of the checks during 1953. The record shows that as the partnership performed work for the L. & A., it billed the railroad on invoices, and waited for payment by *235 check to be delivered through the mails. A taxpayer, maintaining books and records on a cash receipts and disbursements method, who mails bills for services performed, must report payment in the year in which it is actually received regardless of whether the services were rendered, or checks in payment were mailed, in prior years. . We find nothing in the record, nor any authority, which would remove the instant case from this general rule. Respondent cites in support of his contention for constructive receipt of the checks in 1953 the case of , affd. (C.A. 7, 1946). We think that case is not in point. In the Lavery case, the facts were briefly these: In 1941, the taxpayer was managing editor of the American Bar Association Journal and a controversy arose between Lavery and the editorial board of the Association as to policy. The controversy was finally settled amicably by Lavery's agreeing to retire as managing editor with the January 1942 issue of the Journal. The Association on December 30, 1941, delivered to Lavery a check for $2,666.67 as an honorarium for the good services *236 which he had performed and in full settlement of all claims against the Association. Lavery, on the same date, delivered a written acceptance of the check in full satisfaction of any claims that he might have against the Association. Lavery filed his income tax return for the year 1941 on the cash basis. He did not return as income in 1941 the check which the Association had delivered to him on December 30, 1941. Under the facts in the Lavery case, we held that the check for $2,666.67 which he received December 30, 1941, was taxable income to him in that year although he did not actually deposit the check in his bank account until January 2, 1942. Lavery appealed our decision to the United States Court of Appeals for the Seventh Circuit which affirmed our decision. Manifestly, that case is not in point in the instant case. Here, the very essence of petitioners' case is that they did not receive the four checks in question in 1953 and, therefore, did not return them as income until 1954, when they claim they did receive them. As to the three smaller checks, for reasons already stated, we have sustained the Commissioner. With respect to the larger check of $76,703.75, we have sustained *237 petitioners. In doing so we do not think our holding is contrary to In fact, we think our holding is entirely in harmony with it. We hold, therefore, that respondent's determination that the partnership received the check in the amount of $76,703.75 in 1953 is erroneous, but we sustain respondent's determination that the partnership received the three checks in the total amount $650of in 1953. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: A. K. Gillis and Ruth Gillis, Docket No. 77575, and B. G. Gillis, Docket No. 77576.↩
2. Internal Revenue Code of 1939: SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED. (a) General Rule. - The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. * * * ↩
3. Regulations 118: § 39.42-1 When included in gross income - ( a) In general. Except as otherwise provided in section 42, gains, profits, and income are to be included in the gross income for the taxable year in which they are received by the taxpayer, unless they are included as of a different period in accordance with the approved method of accounting followed by him. * * * If no determination of compensation is had until the completion of the services, the amount received is ordinarily income for the taxable year of its determination, if the return is rendered on the accrual basis; or, for the taxable year in which received, if the return is rendered on the receipts and disbursements basis. * * * § 39.42-2 Income not reduced to possession. Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another. If a corporation contingently credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt.↩